**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| KAILASH RATHI and CASEY TART, on behalf of themselves, all others similarly situated, and as representative of a class of participants and beneficiaries on behalf of the Employees Savings and Retirement Plan of Credit Suisse,<br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE SECURITIES USA LLC, THE EMPLOYEE BENEFITS COMMITTEE OF CREDIT SUISSE, and DOES 1-20,<br><br>Defendants. | Case No:<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF ERISA** |

Plaintiffs Kailash Rathi and Casey Tart, on behalf of themselves, all others similarly situated, and as representatives of a class of participants and beneficiaries on behalf of the Employees Savings and Retirement Plan of Credit Suisse (the "Plan"), by and through their undersigned counsel, bring this action against defendants CREDIT SUISSE SECURITIES USA LLC, THE EMPLOYEE BENEFITS COMMITTEE OF CREDIT SUISSE, and DOES 1-20, and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of counsel.

## INTRODUCTION

1. This is a civil enforcement action brought pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against Defendants for breaches of fiduciary duties.

2. The Plan is a defined contribution retirement plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.

3. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's de facto retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

4. The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

5. At all pertinent times, as explained below, Defendants were fiduciaries under ERISA and breached their fiduciary duties under ERISA.

6. ERISA imposes upon fiduciaries "the highest duties known to the law." Those duties include obligations of prudence and monitoring in the selection and retention of investment options offered to participants in a defined contribution retirement plan.

7. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers."[1]

---

[1] *See* U.S. Dep't of Labor, A Look at 401(k) Plan Fees, (Sept. 2019), at 2, *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8. The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts," a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).

9. Defendants breached these duties by imprudently retaining persistently underperforming investment options in the Plan for years despite objectively identifiable indications of persistent underperformance and the availability of materially superior alternatives.

10. During the six years predating the filing of this Complaint (the "Class Period"), Defendants maintained several actively managed investment options that consistently underperformed appropriate benchmarks and comparable peer funds over multiple trailing three-year periods, including:

- Vanguard PRIMECAP Adm Fund ("PRIMECAP");
- T. Rowe Price New Horizons Fund I Class ("New Horizons"); and
- T. Rowe Price Small-Cap Value Fund ("Small-Cap Value").

11. These three funds (the "Challenged Funds") collectively held hundreds of millions of dollars in Plan assets while persistently lagging relative to their benchmarks and similarly situated peer funds over prolonged periods.

12. A prudent fiduciary would have removed or replaced these funds after repeated and sustained underperformance became evident through ordinary fiduciary monitoring processes. But Defendants failed to do so.

## JURISDICTION & VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under ERISA, 29 U.S.C. §§ 1001 *et seq.*, including ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.

14. Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants reside in (*i.e.*, are subject to personal jurisdiction in) this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

15. Plaintiff Kailash Rathi was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) from 2005 until 2025, when he withdrew his funds from the Plan through a rollover of substantially all Plan assets into an individual retirement account.

16. During the Class Period, and up until 2025, Mr. Rathi invested in PRIMECAP and New Horizons, and suffered losses as a result of Defendants' fiduciary breaches.

17. Plaintiff Casey Tart was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7) from 2010 until 2024, when he withdrew his funds from the Plan through a rollover of substantially all Plan assets into an individual retirement account.

18. During the Class Period, and up until 2024, Mr. Tart invested in PRIMECAP, New Horizons, and Small-Cap Value, and suffered losses as a result of Defendants' fiduciary breaches.

19. Defendant Credit Suisse Securities USA LLC ("Credit Suisse Securities") is a Delaware limited liability company with its principal place of business in New York, New York. Credit Suisse Securities sponsored and administered the Plan during the Class Period and exercised

discretionary authority and control respecting management of the Plan and disposition of Plan assets.

20. Defendant The Employee Benefits Committee of Credit Suisse ("Committee") was the named fiduciary responsible for selecting, monitoring, retaining, and removing the Plan's investment options. The Committee exercised discretionary authority and control over Plan management and Plan assets and therefore acted as a fiduciary under ERISA. The Committee is identified in the Plan's Form 5500 filings and financial statements as the administrator of the Plan.

21. Defendants DOES 1–20 are presently unknown fiduciaries, fiduciary committees, corporate entities, successors, predecessors, affiliates, subsidiaries, and/or other persons or entities who exercised discretionary authority or control respecting management of the Plan, disposition of Plan assets, administration of the Plan, or appointment, monitoring, or removal of Plan fiduciaries within the meaning of ERISA, 29 U.S.C. § 1002(21)(A). Upon information and belief, following the June 2023 merger between Credit Suisse Group AG and UBS Group AG, certain UBS-related entities, committees, officers, employees, and/or agents may have assumed, shared, exercised, or participated in fiduciary responsibilities relating to the Employees' Savings and Retirement Plan of Credit Suisse, including but not limited to plan administration, oversight, monitoring, communications, recordkeeping supervision, investment oversight, and/or fiduciary governance functions. The true names, capacities, relationships, and extent of involvement of DOES 1-20, including any UBS-related successor or affiliated fiduciaries, are presently unknown to Plaintiffs despite reasonable investigation. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of these Defendants when ascertained. Each Doe Defendant acted individually and in concert with the other Defendants and is liable jointly and severally to the extent permitted under ERISA and applicable law.

22. Each Defendant was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent it:

- exercised discretionary authority or control respecting management of the Plan or management or disposition of Plan assets;
- rendered investment advice for a fee or other compensation; or
- had discretionary authority or responsibility in Plan administration.

## FACTS

### I. ERISA'S FIDUCIARY STANDARDS

23. ERISA requires fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

24. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under §402(a)(1), 29 U.S.C. §1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. §1002(21)(A).

25. ERISA fiduciaries have a continuing duty to monitor Plan investments and remove imprudent investment options. *Tibble*, 135 S. Ct. at 1828.

26. As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services." DOL 408(b)(2) Regulation Fact Sheet.

27. A prudent fiduciary monitoring process includes:

- reviewing investment performance relative to meaningful benchmarks and peer groups;
- evaluating risk-adjusted returns;
- placing persistently underperforming investments on watch status;
- removing or replacing chronically underperforming investments; and
- documenting and implementing prudent investment oversight procedures.

28. Fiduciaries of large defined contribution plans, like the Plan at issue here, are expected to employ rigorous institutional-quality investment monitoring procedures.

29. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (citation modified). This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. §1104(a)(1)(B). Wasting beneficiaries' money by selecting imprudent investments for the Plan is a breach of a fiduciary's duty.

30. In addition to a duty to select prudent investments, a fiduciary under ERISA "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble*, 135 S. Ct. at 1828. "[A]n ERISA fiduciary's duty is 'derived from the common law of

trusts,'" and "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones," *id*. If an investment is imprudent, the plan fiduciary is "under a duty to dispose of them within a reasonable time." *Id.* (internal quotation marks and quotation omitted). Fiduciaries therefore may be held liable for either assembling an imprudent menu of investment options *or* for failing to monitor the plan's investment options to ensure that each option remains prudent.

## II. PLAINTIFFS' INVESTMENTS IN THE PLAN

31. Plaintiff Kailash Rathi participated in the Plan for approximately twenty years, including throughout the Class Period, and maintained substantial retirement assets invested through the Plan.

32. Throughout the Class Period, Mr. Rathi invested in one or more of the Challenged Funds, including PRIMECAP and New Horizons. Mr. Rathi remained invested in the Plan and exposed to the challenged investment lineup until January 2025, when he withdrew and rolled over substantially all Plan assets into an individual retirement account.

33. Mr. Rathi's January 2025 rollover transactions included withdrawals from PRIMECAP and New Horizons, among other Plan investment options, in connection with the transfer of substantially all remaining Plan assets out of the Plan.

34. Plaintiff Casey Tart participated in the Plan for approximately 15 years, including throughout the Class Period, and maintained substantial retirement assets invested through the Plan.

35. Throughout the Class Period, Mr. Tart invested in one or more of the Challenged Funds, including PRIMECAP, New Horizons, and Small-Cap Value.

36. Mr. Tart held PRIMECAP at least during 2023 and into 2024. Mr. Tart withdrew his investments on or around October 2024 when he withdrew and rolled over substantially all Plan assets into an individual retirement account.

37. Mr. Tart held New Horizons at least during 2023 and into 2024. Mr. Tart withdrew his investments on or around October 2024 when he withdrew and rolled over substantially all Plan assets into an individual retirement account.

38. Mr. Tart held Small-Cap Value starting on or around January 2023 and held it from that point into 2024. Mr. Tart withdrew his investments on or around October 2024 when he withdrew and rolled over substantially all Plan assets into an individual retirement account.

39. Mr. Tart's October 2024 rollover transactions included withdrawals from PRIMECAP, New Horizons, and Small-Cap Value, among other Plan investment options, in connection with the transfer of substantially all remaining Plan assets out of the Plan.

40. As a result of Defendants' breaches of fiduciary duty and imprudent retention of the Challenged Funds, Plaintiffs and the Plan suffered losses relative to materially better-performing available alternatives.

## III. DEFENDANTS' IMPRUDENT RETENTION OF UNDERPERFORMING FUNDS

41. A prudent fiduciary responsible for monitoring investment options in a large defined contribution retirement plan must continually evaluate whether each investment remains appropriate in light of its long-term performance, risk characteristics, benchmark-relative returns, peer-group performance, and available alternatives. Under ordinary institutional investment practices, fiduciaries commonly evaluate investment performance over rolling multi-year periods because isolated short-term fluctuations may reflect temporary market conditions, style rotation, or ordinary volatility rather than persistent investment deficiencies.

42. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments.").[2]

43. The duty to monitor under ERISA requires fiduciaries to conduct ongoing evaluations of investment options and to remove or replace investments that demonstrate sustained underperformance relative to meaningful benchmarks and comparable alternatives over repeated monitoring cycles. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

44. Where "monitoring reveals that the investment is imprudent, a fiduciary must remove the investment." *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 475 (4th Cir. 2020); *see also Tibble*, 135 S. Ct. at 1828.

45. A fiduciary must monitor "the prudence of each investment option available to plan participants" and "the relevant 'portfolio' that must be prudent is each available Fund considered on its own . . . not the full menu of Plan funds." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007).

---

[2] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

46. This is because fiduciaries cannot free themselves from their duty to act as a prudent person simply by arguing that other funds, which individuals may or may not elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio. *Id.*

47. Here, each of the Challenged Funds, considered on their own, demonstrated sustained relative underperformance compared to meaningful comparator funds over repeated trailing three-year review periods.

48. Upon information and belief, Defendants utilized periodic investment committee meetings, performance reports, benchmark comparisons, consultant analyses, and/or watch-list procedures in monitoring Plan investments. The sustained underperformance alleged herein would ordinarily have triggered heightened scrutiny and removal consideration under such monitoring practices. That is, Defendants had repeated quarterly and annual opportunities between 2020 and 2025 to reevaluate, place on watch status, remove, freeze, or replace the Challenged Funds, but failed to do so.

**A. VANGUARD PRIMECAP ADM**

49. During the Class Period, Defendants retained PRIMECAP as an investment option in the Plan despite persistent relative underperformance over repeated rolling review periods.

50. PRIMECAP is an actively managed domestic large-cap equity fund benchmarked against the S&P 500 Index. Because PRIMECAP pursued an actively managed large-cap domestic equity strategy intended to generate excess returns relative to its benchmark, prudent fiduciaries monitoring the fund would reasonably evaluate its performance both relative to its prospectus benchmark and to meaningful peer alternatives with similar investment objectives, capitalization exposure, investment style characteristics, and risk profiles.

51. Meaningful comparator funds for evaluating PRIMECAP's continued prudence include actively managed domestic large-cap equity funds with similar investment objectives, capitalization exposure, and risk characteristics, including:

- JPMorgan U.S. Large Cap Core Plus Fund;
- DFA U.S. Large Company Fund;
- T. Rowe Price U.S. Equity Research Z Class Fund; and
- American Funds Investment Company of America Class R-6 Fund.

52. These comparator funds represented meaningful peer alternatives because they pursued broadly similar actively managed domestic large-cap equity strategies intended to provide long-term capital appreciation while competing within substantially similar market segments and risk profiles.

53. Between 2020 and 2024, PRIMECAP consistently lagged these meaningful comparator funds across repeated rolling three-year review periods commonly utilized in institutional fiduciary monitoring processes.

54. To evaluate the persistence of the underperformance, PRIMECAP's yearly performance was compared against the average performance of meaningful comparator funds, *see* ¶ 51, with similar investment objectives, capitalization exposure, and risk characteristics. The resulting trailing three-year relative-underperformance figures demonstrated sustained lagging performance across successive monitoring cycles rather than isolated short-term market fluctuations.

| Year | PRIMECAP Performance | Comparator Performance Growth (Avg.) | Delta | Relative Underperformance for Trailing 3 Years |
|---|---|---|---|---|
| 2020 | 17.32% | 19.81% | -2.49% | -6.67% |
| 2021 | 21.9% | 27.81% | -5.91% | -9.865% |
| 2022 | -15.09% | -17.59% | 2.51% | -5.945% |
| 2023 | 28.18% | 28.83% | -0.65% | -4.173% |
| 2024 | 13.52% | 26.55% | -13.03% | -11.426% |

55. PRIMECAP also underperformed relevant market benchmarks, including the S&P 500 Total Return Index. For example, PRIMECAP underperformed the S&P 500 Total Return Index by approximately 2.32 percentage points in 2020 and approximately 11 percentage points in 2021. Such benchmark-relative underperformance constituted an additional objective warning sign that the fund no longer represented a prudent long-term investment option for Plan participants.

56. The persistence of PRIMECAP's relative underperformance across multiple consecutive trailing three-year review periods compared to the meaningful comparators identified in ¶ 51, together with its underperformance relative to relevant market benchmarks constituted an objective fiduciary warning sign that the fund no longer represented a prudent long-term investment option relative to available alternatives with comparable investment objectives and risk characteristics.

57. Under ordinary institutional fiduciary practices, sustained underperformance of this nature across repeated monitoring cycles would warrant heightened scrutiny, placement on watch status, and evaluation for removal or replacement.

58. Despite repeated opportunities to reevaluate the fund during successive monitoring cycles, Defendants continued retaining PRIMECAP in the Plan lineup while participants remained exposed to sustained relative underperformance.

59. During the relevant period, the Plan maintained hundreds of millions of dollars in PRIMECAP, including approximately $252 million in Plan assets during 2024 alone.

60. As a direct and foreseeable result of Defendants' failure to remove or replace PRIMECAP within a reasonable period after persistent underperformance became apparent, the Plan and its participants suffered substantial losses relative to materially better-performing available alternatives.

**B. T. ROWE PRICE NEW HORIZONS**

61. During the Class Period, Defendants retained New Horizons as an investment option in the Plan despite persistent relative underperformance over repeated rolling review periods.

62. New Horizons is an actively managed small- and mid-cap growth equity fund focused on companies with above-average growth potential. Prudent fiduciaries monitoring New Horizons would reasonably evaluate its performance relative both to its prospectus benchmark and to meaningful peer alternatives with similar investment objectives, capitalization exposure, growth orientation, and risk characteristics.

63. Meaningful comparator funds included actively managed small- and mid-cap growth funds selected from major market providers and screened for similar characteristics, including size, category, and risk exposure, including:

- JPMorgan Mid Cap Growth Fund;
- ClearBridge Select Fund Class I;
- MFS Mid Cap Growth Fund; and
- Invesco Discovery Mid Cap Growth Fund.

64. These comparator funds represented meaningful peer alternatives because they pursued broadly similar actively managed domestic growth-equity strategies within substantially similar market segments and risk profiles.

65. Although New Horizons experienced periods of short-term outperformance earlier in the Class Period, the fund's relative performance deteriorated substantially over time and ultimately reflected sustained underperformance across repeated rolling three-year review periods commonly utilized in institutional fiduciary monitoring processes.

66. To evaluate the persistence of the underperformance, New Horizons' yearly performance was compared against the average performance of meaningful comparator funds, *see* ¶ 63, with similar investment objectives, capitalization exposure, growth orientation, and risk characteristics. The resulting trailing three-year relative-underperformance figures demonstrated a sustained pattern of deteriorating relative performance over successive monitoring cycles rather than isolated short-term market fluctuations.

| Year | New Horizons Performance | Comparator Performance Growth (Avg.) | Delta | Relative Underperformance for Trailing 3 Years |
|---|---|---|---|---|
| 2020 | 57.92% | 45.84% | 12.08% | 16.913% |
| 2021 | 9.82% | 16.09% | -6.27% | 5.294% |
| 2022 | -36.91% | -29.84% | -7.01% | -2.37% |
| 2023 | 21.49% | 20.48% | 1.01% | -12.01% |
| 2024 | 3.99% | 18.76% | -14.77% | -19.985% |

67. By no later than 2022, New Horizons had begun materially lagging the meaningful comparator funds identified in ¶ 63 on a trailing three-year basis. The underperformance subsequently worsened during the review periods ending in 2023 and 2024.

68. New Horizons also persistently underperformed relevant market benchmarks and category benchmarks during the Class Period. Most notably, New Horizons underperformed the Russell 3000 Total Return Index by approximately 60 percentage points on a trailing three-year basis for the review period ending in 2020, approximately 34 percentage points for the review period ending in 2023, and approximately 37 percentage points for the review period ending in 2024. New Horizons likewise materially underperformed the Russell 2000 Growth Index and the Morningstar Mid-Cap Growth category benchmark across multiple rolling review periods. Such sustained benchmark-relative underperformance constituted an additional objective warning sign that the fund no longer represented a prudent long-term investment option for Plan participants.

69. Under ordinary institutional fiduciary practices, sustained underperformance of this nature across repeated monitoring cycles would warrant heightened scrutiny, placement on watch status, and evaluation for removal or replacement.

70. Despite repeated opportunities to reevaluate the fund during successive monitoring cycles, Defendants continued retaining New Horizons in the Plan lineup while participants remained exposed to sustained relative underperformance.

71. The underperformance of New Horizons was particularly significant because the fund's trailing three-year relative underperformance worsened significantly over time, including trailing-period lagging of approximately 12% by December 2023 and approximately 20% by December 2024 relative to the comparator funds identified in ¶ 63.

72. During the relevant period, the Plan maintained substantial participant assets in New Horizons, including approximately $190 million invested in the fund during 2024.

73. As a direct and foreseeable result of Defendants' failure to remove or replace New Horizons within a reasonable period after persistent underperformance became apparent, the Plan and its participants suffered substantial losses relative to materially better-performing available alternatives.

**C. T. ROWE PRICE SMALL-CAP VALUE**

74. During the Class Period, Defendants retained Small-Cap Value as an investment option in the Plan despite persistent relative underperformance over repeated rolling review periods.

75. Small-Cap Value is an actively managed domestic small-cap value equity fund benchmarked against the Russell 2000 Value Index. Because Small-Cap Value pursued an actively managed small-cap value strategy intended to generate excess long-term returns relative to its

benchmark, prudent fiduciaries monitoring the fund would reasonably evaluate its performance relative both to its prospectus benchmark and to meaningful peer alternatives with similar investment objectives, capitalization exposure, value orientation, and risk characteristics.

76. Meaningful comparator funds included actively managed domestic small-cap value funds selected from major market providers and screened for similar characteristics, including size, category, and risk exposure, including:

- Boston Trust Walden Small Cap Fund;
- Calvert Small-Cap Class I Fund;
- Nuveen Quant Small Cap Equity Fund; and
- Thrivent Small Cap Stock Class S Fund.

77. These comparator funds represented meaningful peer alternatives because they pursued broadly similar actively managed domestic small-cap equity strategies within substantially similar market segments and risk profiles.

78. Between 2020 and 2024, Small-Cap Value consistently lagged behind the meaningful comparator funds identified in ¶ 76 across repeated rolling three-year review periods commonly utilized in institutional fiduciary monitoring processes.

79. To evaluate the persistence of the underperformance, Small-Cap Value's yearly performance was compared against the average performance of meaningful comparator funds, *see* ¶ 76, with similar investment objectives, capitalization exposure, value orientation, and risk characteristics. The resulting trailing three-year relative-underperformance figures demonstrated sustained lagging performance across successive monitoring cycles rather than isolated short-term market fluctuations.

| Year | Small-Cap Value Performance | Comparator Performance Growth (Avg.) | Delta | Relative Underperformance for Trailing 3 Years |
|---|---|---|---|---|
| 2020 | 12.5% | 14.7% | -2.2% | -5.97% |
| 2021 | 25.54% | 24.4% | 1.14% | -2.19% |
| 2022 | -18.55% | -12.78% | -5.77% | -6.8% |
| 2023 | 12.22% | 13.25% | -1.03% | -5.68% |
| 2024 | 10.93% | 13.1% | -2.17% | -8.77% |

80. The persistence of Small-Cap Value's relative underperformance over repeated trailing review periods constituted an objective fiduciary warning sign that the fund no longer represented a prudent long-term investment option relative to available alternatives with comparable investment objectives and risk characteristics.

81. Small-Cap Value also persistently underperformed relevant market benchmarks and category benchmarks during the Class Period. Most notably, Small-Cap Value underperformed the Russell 3000 Total Return Index by approximately 18 percentage points on a trailing three-year basis for the review period ending in 2019, approximately 19 percentage points for the review period ending in 2020, and approximately 13 percentage points for the review period ending in 2024. Small-Cap Value likewise materially underperformed the Russell 2000 Index, the Russell 2000 Value Index, and the Morningstar Small Blend category benchmark across multiple rolling review periods. Such sustained benchmark-relative underperformance constituted an

additional objective warning sign that the fund no longer represented a prudent long-term investment option for Plan participants.

82. Under ordinary institutional fiduciary practices, sustained underperformance of this nature across repeated monitoring cycles would warrant heightened scrutiny, placement on watch status, and evaluation for removal or replacement.

83. Despite repeated opportunities to reevaluate the fund during successive monitoring cycles, Defendants continued retaining Small-Cap Value in the Plan lineup while participants remained exposed to sustained relative underperformance.

84. The underperformance of Small-Cap Value was particularly significant because the fund's trailing three-year relative underperformance remained materially negative across each review period between 2020 and 2024 while the Plan continued maintaining substantial participant assets in the fund.

85. During the relevant period, the Plan maintained substantial participant assets in Small-Cap Value, including approximately $61 million invested in the fund during 2024.

86. As a direct and foreseeable result of Defendants' failure to remove or replace Small-Cap Value within a reasonable period after persistent underperformance became apparent, the Plan and its participants suffered substantial losses relative to materially better-performing available alternatives.

## IV. DEFENDANTS FAILED TO EMPLOY A PRUDENT MONITORING PROCESS

87. Defendants failed to establish and maintain a prudent process for monitoring Plan investment options.

88. Defendants failed to act upon objective indicators of sustained underperformance over repeated review cycles.

89. Defendants failed to remove and replace imprudent investment options within a reasonable timeframe.

90. Defendants failed to protect participants from foreseeable losses associated with retaining persistently underperforming funds.

91. Defendants' fiduciary breaches caused substantial losses to the Plan and its participants.

92. These failures are not just incidental. The Plan's Form 5500 filings demonstrate the existence of conflicted compensation arrangements involving the Plan's recordkeeper, Fidelity Investments ("Fidelity"), and investment options maintained in the Plan lineup.

93. Fidelity, acting as the plan's recordkeeper/custodian, received compensation from T. Rowe Price because the retirement plan offered T. Rowe Price investment funds. Specifically, the Plan's Form 5500 for 2023 says Fidelity received "indirect compensation" from "T. ROWE PRICE SERVICES INC" in the form of "0.30%." In practical terms, this means that when Plan participants invested their retirement savings into the New Horizons and Small-Cap Value funds, a portion of the investment fees charged to participants was shared with Fidelity as indirect compensation. This arrangement created a financial incentive for Defendants to include or retain T. Rowe Price funds, including New Horizons and Small-Cap Value, in the Plan lineup because Fidelity's compensation increased as more participant assets were invested in those funds.

94. By maintaining the T. Rowe Price funds in the Plan lineup, Defendants avoided the risk of upsetting Fidelity, helped ensure Fidelity continued to agree to serve as the Plan's recordkeeper/custodian, and avoided the costs associated with replacing its recordkeeper. At the very least, this arrangement created a perverse incentive for Defendants not to rigorously and objectively scrutinize the continued retention of the T. Rowe Price funds despite persistent relative

underperformance and reinforces the inference that Defendants failed to employ a sufficiently independent and prudent monitoring process with respect to the continued retention of the New Horizons and Small-Cap Value investment options.

## V. LOSS TO THE PLAN

95. Defendants' fiduciary breach was not merely retaining investments that underperformed in hindsight. Rather, Defendants failed to employ and implement a prudent and objective monitoring process capable of identifying, scrutinizing, and removing persistently underperforming investment options despite repeated and objectively identifiable warning signs over multiple years. As a direct and proximate result of Defendants' fiduciary breaches, the Plan suffered at least millions, and likely tens of millions of dollars in losses. The precise amount of losses resulting from Defendants' breaches will be proven at trial.

96. Had Defendants acted prudently, the Plan would have avoided substantial losses by replacing the challenged funds with materially superior alternatives.

## CLASS ACTION ALLEGATIONS

97. While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, including by defining various state subclasses, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan during the Class Period and whose accounts included investments in one or more of the Challenged Funds.

98. Numerosity is satisfied because the Plan had thousands of participants during the Class Period.

99. Common questions of law and fact include:

- whether Defendants were fiduciaries of Plan members;
- whether Defendants breached fiduciary duties to Plan members;
- whether Defendants employed a prudent monitoring process for the Plan;
- whether the challenged funds were imprudently retained in the Plan; and
- the proper measure of losses to the Plan.

100. Plaintiffs' claims are typical of the claims of the Class. Like other Class members, Plaintiffs are Plan participants who suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants' imprudent decisions affected all Plan participants similarly.

101. Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent. They have retained counsel experienced in class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent Class members.

102. The Members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the Class in a single action will provide substantial benefits to the parties and Court.

103. As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3). Questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of

each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and juridical efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breaches of Fiduciary Duty of Prudence
### 29 U.S.C. § 1104(a)(1)

104. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

105. During the Class Period, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1) (29 U.S.C. § 1102(a)(1)), or de facto fiduciaries within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)), or both.

106. The scope of the Defendants' fiduciary duties and responsibilities included managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. Defendants were responsible for, among other things, evaluating the merits of the Plan's investments on an ongoing basis, administering the operations of the Plan and taking all necessary steps to ensure that the Plan's assets were invested prudently, and eliminating imprudent options.

107. Defendants breached their fiduciary duties by wrongfully allowing the Plan to hold the Challenged Funds and to continue to hold them despite persistent underperformance.

108. A fiduciary's investment or investment course of action is prudent if he has: (a) given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) acted accordingly.

109. Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the Challenged Funds as investment options in the Plan. They breached that duty and failed to conduct an appropriate investigation of continued investment in the Challenged Funds.

110. As alleged herein, Defendants breached their fiduciary duties by offering, and continuing to offer, persistently underperforming funds.

111. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

**SECOND CAUSE OF ACTION**
**Failure to Monitor Fiduciaries**
**(Against Credit Suisse Securities)**

112. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

113. During the Class Period, Defendants Credit Suisse Securities and the Committee were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

114. Upon information and belief, Defendant Credit Suisse Securities had ultimate authority over the Plan and possessed the authority to appoint, monitor, and remove members of the Committee. Also upon information and belief, Credit Suisse Securities also received periodic investment performance reports from the Committee and had the authority to receive periodic

reports on other Committee actions. As a result, Credit Suisse Securities had a fiduciary duty to monitor the performance of its appointees.

115. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

116. Credit Suisse Securities failed to adequately monitor the Committee, failed to ensure that the Committee properly discharged its fiduciary responsibilities with respect to the Plan’s investments, failed to remove Committee members whose performance was inadequate, and failed to take appropriate action despite the Committee's continued retention of imprudent investment options.

117. As a consequence of these breaches, the Plan suffered millions of dollars in losses due to investment underperformance. Had Credit Suisse Securities properly monitored its appointees, the losses suffered by the Plan would have been avoided or substantially reduced.

## PRAYER FOR RELIEF

118. Wherefore, Plaintiffs, individually and on behalf of the proposed Class, pray for judgment and respectfully request the Court:

a. find and declare that the Defendants have breached their ERISA fiduciary duties to the participants;

b. find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c. determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

d. order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

e. remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

f. surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

g. order appropriate injunctive and equitable relief requiring Defendants to implement prudent fiduciary monitoring processes;

h. certify the Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as Class Counsel;

i. award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

j. order the payment of interest to the extent it is allowed by law; and

k. grant other equitable or remedial relief as the Court deems appropriate.

Dated: June 26, 2026

/s/ William J. Rhodunda, Jr.
William J. Rhodunda, Jr. (SBN 002774)
**Rhodunda, Williams and Kondraschow, LLC**
1521 Concord Pike, Suite 205
Wilmington, DE 19803
(302) 576-2000
Bill@rawlaw.com

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD*
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE*
*mmonroe@fmfpc.com*
TREVOR FLYNN*
*tflynn@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

**Attorney for Plaintiffs Kailash Rathi and Casey Tart**
**phv applications forthcoming*